This video was made in Cooperation with the U.S. Embassy in the Philippines. Amendment 617, which changed the way that loss amount was to be calculated. So instead of focusing on the amount put at risk, the drafters of the guidelines made clear that that's no longer the issue. The issue is what's the actual loss, or if that doesn't accurately reflect the amount of loss, what is the intended loss? The key to intended loss, which is really the issue in this case, is that the government had a burden at the evidentiary hearing at sentencing to establish what these defendants intended to do. I think the key to understanding the mistake that the district court made below was reading its ruling. And basically what the district court said in its ruling was that it based loss on the amount, the value of the stolen checks, because those stolen checks were potentially negotiable. Again, the problem with that is that it's not looking at what the government proved at the evidentiary hearing about what these defendants' intent was. So how does the district court determine what the intent is? The district court looks to what evidence there is in the record of what these individuals did. Yes, for a day of the arrest, weren't they counterfeiting, using one of the counterfeit checks? That's correct. So what was there in the record to suggest that they just wouldn't keep on going? What we know from the record is that these defendants had in their possession a number of counterfeit checks, and our position is that the district court didn't have to limit itself to calculating loss based upon the checks that these individuals had actually tried to cash. That wouldn't be an appropriate interpretation of intended loss. What the district court should have done was look at what checks these individuals had in their possession and what checks they had made. That's the basis for determining what they intended to do. The district court can't go beyond that and assume without any limit these defendants would have kept on going and kept on going in the absence of any evidence in the record to establish that that's the case. Let me just be a little more specific. The Third and Eleventh Circuit have a rule which essentially says you can look at the face amount, you can look at circumstantial evidence, and at least under one reading puts the burden on the defendant to rebut that. A, do you agree with the rule or the standard applied by the Third and Eleventh Circuit? And B, if so, would you prevail or not prevail under those standards? I don't think this Court has to reject the approach adopted by the Third and Eleventh Circuit in Osborne or Grant. I think what those circuits have said is that you look to the evidence that the government has been able to present with respect to intent. Those cases, in those cases, based on the specific facts set forth by the government, the court was able, the district court was able to determine that, yes, there is evidence that these defendants intended to exploit the full value of the stolen checks. In this case, there was no such evidence in the record. In fact, it was absolutely clear what these defendants were up to. What these defendants were doing was using the stolen checks as templates, and they were creating checks of much less value and attempting to pass those at check-cashing places. So, and I think one thing that makes it absolutely clear that there was no connection between the value of the stolen checks and the value of the counterfeit checks is that there was one stolen check that was valued at, I think, something like $15 or $16. The defendants then created a counterfeit check using that check as a template, valued at something like $850. So there's absolutely no relationship established in the record between the value of the stolen checks and the value of the counterfeit checks. For that reason, there was no basis for the district court to make a conclusion that the loss amount should be based upon the value of the stolen checks. What the district court should have done is absolutely clear. Like I said, base the value of the amount of loss on the counterfeit checks that were found in the defendant's possession and any checks found in the possession of co-conspirators. I make the district court that way. The government's burden is just to prove more probably than not. Is that right? Well, by a preponderance of the evidence. By a preponderance of the evidence. Well, it seems to me anybody that took a check from somebody else, the immediate inference is they intend to cash it, forge a signature. And they've got to disprove that. Now, was there evidence offered by them to disprove what the normal inference would be? If I'm understanding your question correctly, there was absolutely no evidence in the record that these defendants intended or tried. I say the inference immediate from knowing A took B's check is that A intended to use it to forge a signature and go ahead. Now, that's the inference. Did they rebut that inference? The government did not present any evidence. No. I'm asking did your defendants rebut the evidence? The defendant testified that he never had any intention of cashing the actual stolen checks, and there's never been any evidence of that. How was this only evidence, his own statement as to what his intent was? Well, I think here you have to look at the burden. The government has to start by meeting its burden of establishing that there's an intent to cash those checks. But I think that's the immediate inference. It's already there.  These defendants never tried to cash those checks. So that, I think, would clearly establish that there was no relationship between the value of the stolen checks and the amount of loss. If there are no further questions about that, I'd like to just quickly shift to the role enhancement. The point of the leadership enhancement is to identify those who are most culpable in a scheme involving a number of different people. What we had here was a fairly unsophisticated group of methamphetamine users, each of whom had an independent role in this offense. Again, the government at this point had a burden to establish that this defendant is worthy of receiving an enhanced sentence because his role was he was more culpable than the other individuals. And what we had was testimony, again, from Detective Claussen, the main case agent on the case, who was asked repeatedly to clarify how Mr. Santos was more culpable than the others. And he failed to do so. In fact, what he said was all the roles were instrumental, that it's hard to say which person is more significant than anyone else. And the especially troubling thing about this is that Mr. Eisert, the individual, the co-defendant in this case, entered a plea agreement in which he received a two-level downward adjustment for having a minor role. Mr. Santos gets a two-level increase, creating an extremely dramatic difference in sentences between the two of them. If there are no further questions, I'd like to just reserve the last minute for rebuttal. Thank you, counsel. Good morning. May it please the Court. Ellen Andrezi for the United States. The district court did not clearly err when it used the sum of the stolen checks to determine the intended loss. The court made a reasonable estimate, and it followed Grant, which this Court has mentioned from the Eleventh Circuit. And in following Grant, the district court was even more conservative in only summing the stolen checks. If you look at Note 2 in Grant, they talk about the face value of the photocopied checks plus an undisputed intended loss of approximately $47,000, which one can infer is the counterfeit checks. And it came up with that total by adding both the counterfeit and the photocopied checks. Now, the government's position here was that position, sum both the stolen and the counterfeit. In terms of intended loss, what we have here and what the defense was misreading was in 2001, as the government mentioned in its brief on page 13, 2F1.1 and 2B1.1 were merged. This does not eviscerate the idea of the face value of the checks that were stolen. And the Ninth Circuit repeatedly, in solely mail fraud cases and then solely counterfeit cases, using the face value. With respect to the intent that the Court could find and did find, the defendant has prior convictions for similar state crimes, and he said that he owed $60,000 for a past crime, and that's at 98, lines 17 and 18. The defendant kept the checks. And in our experience, not many mail thieves do, and identity thieves do. They keep notebooks rather than hauling around mail. And that's what exactly this defendant did. He moved from one apartment to the other, and instead of leaving the checks or discarding them, he moved them. And those checks were found in a parole search in his van. Also, we have evidence that the defendant stole checks from a former employer, Wardlow. Now what do we do with this anomalous check out of the ones that were stolen? I mean, relatively anomalous, 1144, which is $137,000. Is there any suggestion that they were actually passing checks that came anywhere close to that amount? Well, no. And what we have here is the potential loss limited, because what this is is a construction check which was stolen from a construction company. You run that risk of pulling a check to a subcontractor. But the methods and means of cashing up to at least that $100,000 check are very clear. If they had acted quickly, they could have sold that check to a more sophisticated buyer. They could have counterfeited up to that amount, and most likely beyond that amount. I don't understand how that they could have run it out like that. I mean, doesn't the district court have to look to the evidence of what they actually did? I mean, under the ‑‑ it's circumstantial evidence that we're looking at. Correct. Not just whatever the defendant says he would have done. But if you look at the circumstantial evidence, you look at what they actually did instead of speculating what they might have done. Correct. But under the guidelines at first in determining this, it's also the harm, the potential harm to the victim. What we have here are a number of sub-$1,000 checks, which the defendant said are easiest to cash. We have attempted on the same day multiple $1,000 advances, so that ‑‑ They would have had to engage in a heck of a lot of transactions to get up to $136,000, $137,000. If they were doing it all themselves, because this information could also have been sold to a myriad of ‑‑ Is there evidence that they tried to do that? Of selling them? No. So why ‑‑ you could posit all sorts of things. But, again, I come back to the point, if we go with the Third and Eleventh Circuit rule, you have to look at the circumstantial evidence. And if it's just they could have done all sorts of things, you're still looking at the circumstances of what they actually did to figure out from that what their likely intent was. And I think for that the circumstantial evidence is what they didn't do. They kept the check. They kept using that account number. They kept using that routing number. They didn't destroy it as they did in Osborne. How many checks did they use to write a copy off that check 1144? That would be an attack, I think. Let's see. With that, what I believe is that there was a question about whether or not they are the union bank checks. Looking at page 2 of Exhibit 8 under tab 2 of the excerpts of record, I can confirm that with the Court by just looking at the checks that have been submitted through evidence. But it looks as if we have 1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, 12, 13. At least 13. 13 that were copied from that one? Approximately. And I can confirm that for the Court. And what amount, the 13, total amount, roughly? Total amount would be, let's see. We've got the 522, the 469s, the 1700s. I can't do the math that quickly, Your Honor. But what it is, is you've seen, you have an example of the use of this account for just under limits that will identify them as check counterfeiters. Now, the defendant also mentioned that there was a real check for $15.93, and they What he fails to mention is that's a check from New York Life. So that number and that account number could be used repeatedly before New York Life would even have noticed. And so by arguing that, you know, amount put at risk doesn't work, which I agree, I believe that's not there, you could extrapolate that argument out to whatever New York Life had in its bank account. What we have here is the defendant's intent. We are following what the Ninth Circuit has done in terms of stolen checks in both mail theft cases and counterfeit cases. There is no law here in the Ninth Circuit yet where we have mail and counterfeit together. But the district court followed the guidance of the Eleventh Circuit in Grant, and Grant itself cites to Osborne in the tenth and Himmler in the third. And I think that gives this Court the basis to follow that instruction. And in terms of the last two minutes, let me turn to the other issue, which is whether he's an organizer, leader, manager, or supervisor. Is it your position that there are three people involved in this? More than three, Your Honor. What it is, the two main folks are the defendant Santos and Cowboy. We never identified Cowboy. He, too, would have gotten a two-level increase. And the third was Eisner? Excuse me? Was the third Eisner or Eisner? Eisner was one of the – Eisner stole the mail and sold it to Santos and then left that conspiracy. He was paid with a counterfeit check made by Santos and Cowboy, and when he tried to cash that check, he was arrested. But that's the only evidence that we have about his participation, is selling the mail. Whereas we have Santos, combined with Cowboy, recruiting multiple people, including Lorraine Ivey and the two that tried to cash the checks earlier in the day. Santos housed Cowboy so that he had a place to counterfeit the checks. And he was the go-to person. He was the person who could get these checks counterfeited. He was the person who could distribute stolen mail. He was truly the glue that held all of this together. And for that reason, I believe he deserved the two-level enhancement. Eisner stole the mail and turned it over to Cowboy and the defendant. And did he just do this once on one occasion? Well, what we have here is from Eisner. He stole the mail and he turned it over to the defendant, Santos. Evidence shows, and what we can infer, especially because there are stolen checks from Santos's employer, is that Eisner did not steal all of the checks, but at least some of them, because we know that his fingerprints were on some of the checks, and he admitted to giving Santos the little grocery bags full of mail. But after that point, he was removed from this whole scheme. So while he was an element of it, I believe that it was a minor role. A minor role, yes. Just stealing the checks and turning them over. As opposed to being part of the larger counterfeiting group. And getting 50 percent of the profits. Excuse me? He got 50 percent of the profits also. He was supposed to. He didn't. He was arrested. All right. Thank you. Thank you, Your Honor. Just very quickly on leadership enhancement. So it's clear. Mr. Eisner obviously also cashed stolen checks. And what the guidelines say is that the district court was supposed to consider a number of different factors in determining who is most culpable. That's set forth in an application note. What the guidelines don't say is that if one of those factors applies, the leadership enhancement automatically is something that should be given. So what the district court is supposed to do is do sort of a holistic evaluation of the facts and determine which of these people really is most culpable. Each of these people had an important role. Cowboy arguably had the most important role because he had the skill to create these checks. Mr. Eisner provided the materials with which to create this scheme. On a loss amount, again, very briefly, just so the record is clear, I think Ms. Andrese misspoke. The number of counterfeit checks created on the account of the Ashwood construction, which is the $136,000 check, I think was close. It was something like eight. It wasn't 15. I think she mistakenly included in that list checks that were actually real. And I think Judge Fischer pointed out the big problem with the government's argument, which is that it's encouraging the district court to engage in pure speculation about what these individuals' intent was. And what they're doing, again, is presenting scenarios that could have happened. There was no evidence of that. And for that reason, the district court erred in calculating loss in that way. How much time passed between the time the checks were stolen and the time they were arrested? My understanding is that the checks were stolen in late August. Mr. Eisner was arrested on September 2nd trying to cash one of those checks. Ms. Ivey was arrested at the check-cashing store on September 14th. And my client, Mr. Santos, was arrested on October 6th. So it was slightly more than a month between the time the checks were stolen and the time that my client was arrested. Thank you, counsel. Thank you. The case just argued is submitted. The next case for oral argument is Brown v. Schwarzenegger.
judges: Reinhardt, Noonan, Fisher